Mancuso v Health (2019 NY Slip Op 03520)





Mancuso v Health


2019 NY Slip Op 03520


Decided on May 3, 2019


Appellate Division, Fourth Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on May 3, 2019
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Fourth Judicial Department

PRESENT: CENTRA, J.P., CARNI, LINDLEY, TROUTMAN, AND WINSLOW, JJ.


1390 CA 17-01811

[*1]DANIEL MANCUSO, AS EXECUTOR OF THE ESTATE OF ROSE M. KIJ, DECEASED, PLAINTIFF-RESPONDENT,
v
KALEIDA HEALTH, DOING BUSINESS AS MILLARD FILLMORE GATES HOSPITAL, DEFENDANT-APPELLANT. (APPEAL NO. 1.) 






GIBSON, MCASKILL & CROSBY, LLP, BUFFALO (MICHAEL J. WILLETT OF COUNSEL), FOR DEFENDANT-APPELLANT.
BROWN CHIARI LLP, BUFFALO (MICHAEL C. SCINTA OF COUNSEL), FOR PLAINTIFF-RESPONDENT. 


 Appeal from a judgment of the Supreme Court, Erie County (Donna M. Siwek, J.), entered January 17, 2017. The judgment awarded plaintiff money damages upon a jury verdict. 
It is hereby ORDERED that the judgment so appealed from is affirmed without costs.
Memorandum: Plaintiff commenced this action alleging that the negligence of defendant caused plaintiff's decedent to suffer serious and permanent injuries, including severe rhabdomyolysis and renal failure, conscious pain and suffering, and death. The case proceeded to trial, and a jury awarded plaintiff $1,000,000 for decedent's pain and suffering, fear of death and/or pre-death terror. After a judgment was entered on the verdict, Supreme Court denied defendant's motion to, inter alia, set aside the verdict. We affirm.
Decedent, who was 81 years old at the time, was admitted on August 16, 2007 to Millard Fillmore Gates Hospital (hospital), which is owned by defendant, for complaints of left-sided weakness and was diagnosed with having a transient ischemic attack (TIA). Decedent had a history of high cholesterol, coronary artery disease, and TIAs. She was taking Simvastatin, a cholesterol-lowering medication that her primary care physician began prescribing in 2006 in the dosage of 20 mg/daily. A possible side effect of Simvastatin, especially when taken in high doses, is the risk of developing rhabdomyolysis, which is the breakdown of muscles and resulting kidney damage.
After decedent was admitted to the hospital, she was prescribed 80 mg/daily of Simvastatin. Her hospital chart showed that the admitting physician ordered that she "continue on" the 80 mg/daily dosage, even though it was undisputed that she was taking only 20 mg/daily of that medication at the time of her hospitalization. The hospital staff received a list of decedent's medications from the ambulance crew, which listed Simvastatin but not the dosage amount, and the emergency room nurses testified that it was the responsibility of the hospital to ask the family or call the patient's pharmacy, which name they were given, to obtain the correct dosage of the medications. There was no testimony given regarding how or why decedent's dosage of Simvastatin was changed upon admission to the hospital.
After five days at the hospital, decedent's TIA symptoms improved and she was discharged for rehabilitation to Crestwood Health Care Center (Crestwood) for one week and then to Riverwood Health Care Center (Riverwood) (collectively, the Elderwoods). Crestwood and Riverwood continued giving decedent 80 mg/daily of Simvastatin, and her condition steadily deteriorated after a week at Riverwood. Her muscles became sore and weak, and she was eventually unable to lift her arms or head or get out of bed. She lost bladder control, was unable [*2]to feed herself, and was in pain. Laboratory tests showed that she had extremely high levels of creatine phosphokinase, an enzyme that is released into the bloodstream as muscles break down, and she was diagnosed with rhabdomyolysis. Riverwood discontinued giving her Simvastatin on September 13, 2007 and transferred her to Kenmore Mercy Hospital the following day. Decedent continued to deteriorate, her kidneys were failing, and she underwent dialysis and eventually died on October 10, 2007. The cause of death was severe rhabdomyolysis and renal failure.
Defendant's primary contention on appeal is that the court erred in precluding it from asserting the CPLR article 16 defense at trial. Under the unique circumstances of this case, we see no error by the court. Plaintiff initially commenced this action against defendant and the Elderwoods, and defendant, in its answer, asserted CPLR 1601 as an affirmative defense and asserted CPLR article 14 cross claims against the Elderwoods. When plaintiff discontinued the action against the Elderwoods, defendant's cross claims against them were converted to a third-party action. Discovery and motion practice ensued, and a trial on both plaintiff's action and defendant's third-party action was scheduled for September 2015. In July 2015, the Elderwoods moved to sever the third-party action on the ground that defendant had delayed discovery in the third-party action such that the discovery could not be completed before the upcoming trial date. The Elderwoods argued that they would be unduly prejudiced if forced to go to trial, and plaintiff would be unduly prejudiced by delaying the trial, so severance was "the only equitable solution." Defendant opposed severance, and the motion was denied.
The trial was rescheduled for November 2, 2016. On October 19, 2016, the court notified the parties that the trial would not start until November 9th, but jury selection would remain scheduled for November 2nd. On October 31, 2016, defendant, who had opposed the Elderwoods' motion for severance the previous year, brought an order to show cause seeking severance of the third-party action. Defendant argued that severance was "now appropriate to avoid undue delay to the main action, prejudice to plaintiff, jury confusion, unnecessary expense to the parties, and waste of judicial resources." Defendant's counsel explained that he possibly had a scheduling conflict based on the new trial date because he had another trial scheduled to begin on November 21st. He therefore proposed severing the third-party action to make "the trial shorter and more efficient" with "less proof, fewer witnesses, fewer experts, and fewer attorneys." Importantly, counsel represented that "proof in the third-party action will not be duplicative to that put on in the main action. The proof in the third-party action would be limited to the care [decedent] received at the Elderwoods' facilities, which will not be a topic in the main action" (emphasis added). Counsel also argued that trying the actions separately would be less confusing to the jury because "there is a risk that the jury will struggle to differentiate the issues between the plaintiff and [defendant] and [defendant] and the Elderwoods."
Both plaintiff and the Elderwoods initially objected to severance, but, on November 1st, defendant and the Elderwoods stipulated to sever the third-party action. The order to show cause was not signed by the court and thus was never served upon plaintiff's counsel, but plaintiff's counsel represented at oral argument before this Court that representations similar to those made by defendant's counsel in his affidavit were made during the course of off-the-record conversations in the court's chambers, which defendant does not dispute.
At the ensuing jury trial, after plaintiff rested his case, defendant gave notice that it intended to submit evidence of fault against the Elderwoods and asked to have them included on the verdict sheet pursuant to CPLR article 16. The court prohibited defendant from introducing evidence of any negligence of the Elderwoods and denied defendant's request to instruct the jury to determine if the Elderwoods were at fault in causing decedent's injuries.
Subject to certain exceptions that are not applicable here (see CPLR 1602), CPLR article 16 provides that, in personal injury actions, "a tortfeasor whose culpability is apportioned at 50% or less is liable only for its proportionate share of noneconomic loss (e.g., pain and suffering, mental anguish) (CPLR 1600, 1601 [1])" (Sommer v Federal Signal Corp., 79 NY2d 540, 556 n 6 [1992]; see Morales v County of Nassau, 94 NY2d 218, 223 [1999]). The Legislature enacted CPLR article 16 in 1996 as part of a broad tort reform package (see Morales, 94 NY2d at 223). The legislative history shows that the "driving purpose" behind the intent to "remedy the inequities created by joint and several liability on low-fault, deep pocket defendants . . . was to alleviate a liability insurance crisis" (Artibee v Home Place Corp., 28 NY3d 739, 750 [2017] [*3][internal quotation marks omitted]). As provided in CPLR 1601 (1), a defendant may raise the CPLR article 16 defense regarding a nonparty tortfeasor, provided that the plaintiff could obtain jurisdiction over that party (see Hendrickson v Philbor Motors, Inc., 102 AD3d 251, 254 [2d Dept 2012]).
We agree with the court here that, because of the representations that were made by defendant when requesting severance of the third-party action, i.e., that the Elderwoods' care would not be a topic in the main action, it would be unduly prejudicial to plaintiff to allow defendant to then assert a CPLR article 16 defense based on that very topic - the care at the Elderwoods - in this case after plaintiff had rested. We agree with defendant that the fact that the third-party action was severed does not extinguish a defendant's article 16 defense. But, in this case, defendant represented before the trial started that the topic of care at the Elderwoods would not be discussed. If defendant had not made this representation, then plaintiff could have preempted or otherwise addressed this anticipated defense through opening statements and plaintiff's own lay and expert witnesses in plaintiff's case in chief, and thus could have suggested that the Elderwoods were not negligent before resting. As plaintiff's counsel asserts, he could have examined his witnesses at trial differently had he known that the topic of the Elderwoods' care, and thus the CPLR article 16 defense, was still on the table.
Although there was some testimony at the trial regarding the care decedent received at the Elderwoods, the main focus of the trial was the issue of defendant's medical treatment and conduct. Defendant's representation that the medical care rendered by the Elderwoods would not be an issue at plaintiff's trial affected plaintiff's strategy and presentation of his case. As noted above, it was not until plaintiff had rested his case that defendant asserted that it would submit evidence of the Elderwoods' alleged negligence and asked to have them included on the verdict sheet. We agree with plaintiff that, under the circumstances presented here, it would be unfair to plaintiff to allow defendant to address the Elderwoods' care and assert the CPLR article 16 defense at that point.
Defendant's remaining contentions on appeal are without merit. Defendant first contends that the court erred in denying its request to give the error in judgment charge to the jury. It is well settled that "a doctor may be liable only if the doctor's treatment decisions do not reflect his or her own best judgment, or fall short of the generally accepted standard of care" (Nestorowich v Ricotta, 97 NY2d 393, 399 [2002]). An "error in judgment" charge "is appropriate only in a narrow category of medical malpractice cases in which there is evidence that defendant physician considered and chose among several medically acceptable treatment alternatives" (Martin v Lattimore Rd. Surgicenter, 281 AD2d 866, 866 [4th Dept 2001]; see Nestorowich, 97 NY2d at 399; Anderson v House of Good Samaritan Hosp., 44 AD3d 135, 139-140 [4th Dept 2007]).
This case does not fall within that narrow category (see Rivenburg v Highland Hosp. of Rochester [appeal No. 2], 72 AD3d 1571, 1573 [4th Dept 2010]). There was simply no evidence that there was any judgment made by hospital personnel to administer 80 mg/daily of Simvastatin to decedent. Decedent's hospital chart showed that the attending physician ordered her to "continue on" 80 mg/daily of Simvastatin, which was a clear error because she had been taking 20 mg/daily of that drug. Defendant never called that physician to testify as to the circumstances of prescribing 80 mg/daily of Simvastatin. The evidence suggested that the hospital employees made a mistake and did not make an actual decision or judgment to increase the dosage. Although the testimony of defendant's expert showed that there could be circumstances under which prescribing 80 mg/daily of Simvastatin was a medically acceptable alternative, there was simply no evidence that anyone ever considered this alternative. Without evidence that medical personnel exercised any judgment or made any choice among medically acceptable alternatives, an error in judgment charge was simply unwarranted (see generally Nestorowich, 97 NY2d at 399-400).
Next, defendant contends that it was prejudiced when the court allowed decedent's treating physician to provide expert opinion testimony that he would not have administered 80 mg/daily of Simvastatin to decedent. We agree with plaintiff that defendant opened the door to that testimony by giving the jury the impression during cross-examination that, had the physician reviewed decedent's entire hospital record, he would conclude that administering 80 mg/daily of Simvastatin was appropriate. In any event, the disputed testimony that was objected to on re-direct examination was essentially the same testimony that the physician had given during his [*4]direct examination, upon which there was no objection.
Finally, defendant contends that the damages award deviates materially from what would be reasonable compensation (see CPLR 5501 [c]). Although defendant relies on Backus v Kaleida Health (91 AD3d 1284 [4th Dept 2012]), where the plaintiff also developed rhabdomyolysis, the plaintiff in that case had a much less severe case of rhabdomyolysis. Here, decedent developed rhabdomyolysis of her entire body. She became progressively weaker as her muscles broke down; she could not lift her arms, then could not walk, then could not keep her head up and lost bladder control. Her kidneys failed and she underwent dialysis. As her condition worsened, besides the increasing pain she felt, she was also aware that she was dying. Decedent began having symptoms of rhabdomyolysis around September 4th, and she died on October 10th, meaning that she had pain, suffering, and thoughts of her impending death for a month. We decline to disturb the damages award.
All concur except Carni and Lindley, JJ., who dissent and vote to reverse in accordance with the following memorandum: We dissent and vote to reverse the judgment in appeal No. 1, grant defendant's posttrial motion in part, set aside the verdict, and grant a new trial. In our view, Supreme Court improperly precluded defendant from introducing evidence of the negligence of Crestwood Health Care Center and Riverwood Health Care Center (collectively, the Elderwoods) and pursuing an offset pursuant to CPLR article 16 (see generally Siler v 146 Montague Assoc., 228 AD2d 33, 40-41 [2d Dept 1997], appeal dismissed 90 NY2d 927 [1997]). As the majority notes, the severance of the third-party action against the Elderwoods did not extinguish defendant's article 16 defense (see Anderson v House of Good Samaritan Hosp., 44 AD3d 135, 144 [4th Dept 2007]; DiCamillo v County of Nassau, 293 AD2d 563, 564 [2d Dept 2002]). Instead, the majority concludes that certain representations made by defendant in connection with severance of the third-party action also suggested that defendant would not pursue an article 16 defense at trial, and that plaintiff was entitled to rely on those representations. Based on the record before us, it appears that those representations were limited to defense counsel's attorney affidavit, submitted to the court in support of an order to show cause seeking severance.
As an initial matter, based on the record on appeal, it does not appear that plaintiff argued below, as he does on appeal, that the representations in this attorney affidavit prejudiced him, led him to believe that defendant would not pursue a CPLR article 16 defense at trial, or otherwise precluded defendant from pursuing that defense. Plaintiff's contentions that the representations contained in defendant's attorney affidavit prejudiced him or otherwise should have precluded defendant from raising an article 16 defense at trial are therefore not properly before us (see generally Ciesinski v Town of Aurora, 202 AD2d 984, 985 [4th Dept 1994]).
Moreover, the record establishes that the court did not sign the order to show cause, it was not filed, and severance was thereafter accomplished by stipulation. Further, defense counsel represents on appeal that plaintiff was not served with the affidavit, did not receive a copy before trial, and thus could not have relied on it. Under these circumstances, we do not believe that plaintiff was entitled to rely on representations in defense counsel's attorney affidavit submitted in support of the ultimately unsigned order to show cause, especially where the record does not reflect that plaintiff received a copy of the affidavit before trial. Aside from these representations, the record does not reflect an alternative basis for the court to preclude defendant from introducing evidence of the Elderwoods' negligence in order to pursue an offset pursuant to CPLR article 16.
Entered: May 3, 2019
Mark W. Bennett
Clerk of the Court